Thanks to this court and to your staff for accommodating me here as well today. May it please the court, my name is Mithun Kamath. I'm here on behalf of Darrel Vannoy, who's the warden of the Louisiana State Penitentiary. And the state's appeal presents two issues. The first is whether the respondent's federal habeas petition can overcome its untimeliness pursuant to the actual innocence exception of McQuiggan v. Perkins. The second issue is whether material evidence was withheld at the respondent's trial in violation of Brady v. Maryland. Your voice is carrying pretty well, but pull the microphone just about three inches closer, if you would, please. All right. As to the first issue, the McQuiggan issue, this again presents a bar to the respondent's habeas application if it's found that actual innocence isn't established. And the McQuiggan issue has not been established in this case. The district court found five particular... Let me interrupt you to ask how you can say actual innocence hasn't been established on a basis of judicial estoppel in the light of your concession in your reply brief that Mr. Floyd should not be in prison? Your Honor, that's a good question. I think the difference that the state makes is that although we may be comfortable with the respondent being out of custody, and we have offered two plea agreements in the course of this litigation, that's different from establishing precedent that the district court did in its opinion that would open up McQuiggan to cases like this one. And the state just simply isn't comfortable with the precedent that the district court opinion establishes. So this is a very fact-intensive case. The precedent you spoke of being worried is the McQuiggan precedent, not the McQuiggan precedent. McQuiggan went above and beyond and more specifically committed clear error in its finding of facts and in its conclusions of law. We believe that McQuiggan shouldn't be used in a context like this, where the evidence claimed to be new by the respondent really isn't new, and moreover, it's unreliable. And that's the standard that McQuiggan sets. This evidence, and again, I can get into the facts here, there's five particular items of evidence claimed to be new by the respondent and found to be new by the district court that we believe are not new at all. And if I can get into those, the first is fingerprint evidence found at both crime scenes. So there's two crime scenes. One is the murder of Bill Hines. The fingerprints were lifted from both crime scenes, and the respondent here claims that this fingerprint evidence is new. In fact, it's not new at all. In response to discovery pursuant to usual practice, the State turned over all incident reports and crime scene reports, which are relevant to this case. Prior to trial, the crime scene reports here specifically depicted the crime scenes. This is all in the State court record in volume two, these reports, and it's evidenced that the defense knew about these fingerprints prior to trial by the trial testimony. So the State court record, or here, the record on appeal, bears this out. First, the detectives, the two lead detectives on these crimes themselves, explicitly referenced the crime scene reports in their testimonies, and moreover, defense counsel specifically referenced the collection of physical evidence, both in his opening statement and then specifically in a motion for new trial, which was filed nine days after the conclusion of trial only. And in that motion, the defense counsel stated, no fingerprints or other physical evidence taken from the scene of the Hines homicide point in any way to the presence of John Floyd at Bill Hines' apartment. This is a clear statement from defense counsel that they knew that no matching fingerprints had been taken from either crime scene, none that matched the Respondent in this case. Sotomayor. Why wouldn't the record support that they knew fingerprints, items, vital items, the glasses or whatever, had been dusted? But what is there to show that there were then comparisons made and it was determined that someone other than Floyd was using those glasses or bottles? Your Honor, it's my understanding that at least at the time that this crime was committed in 1980, if not now, when fingerprints are collected, the crime scene reports are turned over to the defense as they were in this case. But if no reference sample that is turned over to the crime lab is not matched to a particular individual, in this case, the respective victims and the Respondent, no reports would be generated, no collection document would be generated for either the State or the Respondent. And I'll note in this case … I thought the evidence here was the prosecutors themselves said we didn't know the comparison had been done. That's correct. And actually, one of the affidavits produced by the Respondent here from the trial ADA, Mr. Plavnicky, specifically noted, yes, none of the ADAs seem to recall fingerprint cards being turned over, but that's exactly my point. Mr. Plavnicky said … I guess I'll just cut to the chase. It seems to me it's very hard to say it's not new when Judge Vance relies on representations made in the pleadings here to when the prosecutors at the And three, when you read the trial record, there is no evidence ever offered that somebody else's fingerprints were on the bottles or the glasses that Dillman was pointing to. Those three things make it really seem powerful that it was new. And, Your Honor, just to go back to the affidavit that I was just referencing, Mr. Plavnicky said specifically in that affidavit, quote, non-matching prints would mostly not be reported to the DA's acting as a fact finder here. The ADAs were experienced in this case. The Defense Council was very experienced in this case. So the comparison wasn't done at all? Is that your position at the time? No, Your Honor. The comparison may have been done, but even if it was, no matching, because the prints didn't match the victim or the Respondent in this case, no report would have been generated either for the State or to the Respondent. That then bleeds to me directly into the Brady question. You answer one, it sort of answers the other. Because I agree, if you go around a house and you dust everything and you find other people's fingerprints, that's, quote, neutral. As you keep saying in your brief, that's worth nothing. You wouldn't have to disclose it. But if your lead witness, your chief investigator says, and by the way, fact finder, judge here, the murderer, Mr. Floyd, told me that he was drinking with his victim. At that point, what might have been neutral becomes devastatingly powerful impeachment evidence. I think, Judge, there's flaws in that theory as well. Specifically, as it relates to the fingerprints, it is true that Detective Dillman, the lead detective in the Hines case, theorized, and it was the theory of the defense case at the time, that the victim and the perpetrator of the crime shared a drink together. I think there's flaws in that case, and that's one of the things that, flaws in that theory, I should say, and that's one of the things that distinguishes it from the Robinson case. Specifically, with the fingerprints here, the Detective Dillman recollected at trial, which was approximately, I think, a little over a year after the incident, that he recollected that two whiskey glasses were found on either side of the victim where the crime occurred. In fact, that's directly contradicted by one of these crime scene reports, which was, you know, generated on the day of the offense, of course. This is the whole problem I have with both arguments. You're trying to impeach Dillman now yourself. In your reply brief, you call it speculation, and you say it's what he said to the judge at trial couldn't have been true. But this fingerprint evidence would have been exactly what a defense attorney would want. Chief investigator said, victim told me they were drinking together. And you've got a fingerprint report that shows the drinks don't have his prints, they have somebody else's. All they then do is impeach, and that's Brady. The fingerprints, Your Honor, that were found, that were found on a, not on the glasses, actually. The fingerprints that were lifted from the Hines case were found on a whiskey bottle, one of several whiskey bottles that was at the crime scene. And part of the reason that Detective Dillman believed in this theory that the victim and the perpetrator drank together was because the prints were lifted from one of those bottles. But the district court and the respondent in the first instance thought this to be or relied heavily on the fact that this was a bottle that was out on the kitchen table. There's pictures from the crime scene that are included in the record on appeal that also contradict this, namely that the whiskey bottle that was, that did include fingerprints, was not really on the kitchen table. It could have been anywhere else in the kitchen. And so you're right, Your Honor. Detective Dillman did think that at the time of the crime. It's not so much that he thought it, like in the interview in his book. It's that he testified under oath to it. And we have a no physical evidence case. We have subsequent type A versus type O, a huge amount of difficulty. And the tandem confessions don't work. This is a really difficult case to prove. The chief investigator says, oh, yes, Judge, the victim told me he was drinking together. And the government's gotten its possession that the drinks have someone else's prints but not his. How can that not be favorable and material? Your Honor, first, as it relates to the Quiggin point, and I do want to get to the Brady point, but again, the defense attorney at trial would have known that fingerprints were collected from the crime tech report that was turned over and would have known, based on the fact that no report was generated, that no prints matched the victim and the respondent. And because these prints belong to a third party does not mean another flaw with this argument is that it does not mean that, as the district court found, that's evidence of a third party in the victim's home. Because the prints were on a bottle, those prints could have been placed at any point prior to the crime, in any location, at, you know, at any time. What's in the record as to what the defense attorney supposedly knew at the time of trial? Well, as I mentioned— No, I'm talking about an affidavit or something that would be— Directly in point to whether he did or did not know about these. I thought the state, in effect, had conceded it didn't produce these documents to the defense. The actual fingerprint cards that were found by the respondent may not have been turned over themselves, but the state— Wait a minute. May not have been or were not? Well, it's likely that they were not turned over, Judge, but the state's point here is that even if they were not turned over, that's not new evidence from a Quiggin, and it does not mean that they were withheld pursuant to Brady because the defense counsel knew at trial. And defense counsel, unfortunately, I believe he had passed by the time of the PCR hearing. He wasn't able to testify. But again, the state court record bears out, based on the statements I mentioned earlier from defense counsel in his opening statement and motion for new trial, that all parties were aware that fingerprints were collected and they did not match the victim or the respondent in this case. All parties, again, very experienced, would have known that there was no link to the crime scene. You know of a Brady case in a murder where you have a witness inculpating a defendant saying, we drank together, where Brady wouldn't apply because the defense didn't say, oh, and by the way, did you actually compare them, rather than just know that prints were dusted? I don't know of any cases. I would think Brady would require you to turn that over, especially when your witness says they drank together. I don't know of any cases, Judge. And on the Brady point, I know I'm running low on time, so I will go to what you want to say. I think we talked about it. Go to your point. All right. I want to focus on McQuiggin for my last minute here. Because you've had a lot of questions, I'll give you five additional minutes. And of course, the other side gets five minutes as well, if you have other points that you want to cover. Thank you, Judge. So you have six minutes left. Thank you. On the McQuiggin issue, then, we talked a lot about fingerprints. There's four other pieces of evidence the district court found to be new and reliable in this case. I just want to go through those real briefly and explain why the state believes that none of those items are actually new and they're not reliable. After the fingerprints, the second one is African-American hairs found at the new, new hairs found and DNA tested from the Robinson crime scene. Again, the collection of evidence, reports documenting the collection of evidence, including African-American hairs, were turned over in discovery pursuant to regular procedure pre-trial. These reports specifically documented that African-American hairs were collected at both crime scenes. Again, this is borne out in the state court record. The defense filed, in fact, at trial, prior to trial, I should say, a motion for independent examination of hair sample, which explicitly, you know, listed from the crime report what hairs the defense wanted examined. And again, it specifically listed African-American hairs at both crime scenes. The fact that DNA evidence was conducted on these items does not make it new evidence because all parties knew at the time, similar to the fingerprint evidence, what evidence was collected here. The third piece of evidence claimed to be new by the district court is an allegation that Detective Dillman coerced the respondent's confession in the Hines case. Again, not new evidence. This evidence was presented. The issue was litigated at a four-day motion to suppress hearing in advance of trial. What does the law say about the McQuiggan analysis? If new as to anyone, then district court can look at the totality, or is your position each piece has to be new? I think each piece to be concerned, I think if it's established Do you have a case that helps us on this? For McQuiggan itself, I believe, I don't have a case on me, but McQuiggan itself says that if the court deems a piece of evidence to be new, it then can examine, you know, all evidence old and new. For me, the biggest issue here is the fingerprint. So if that's new, this is a difficult, did you have an alternative argument? If we decide it's new, hence the petition's timely, do you have in three minutes or where do you go from there? Your Honor, if this court deems the fingerprints to be new, again, first, I would argue, as I have, that it's unreliable, but again, besides setting that aside, you know, I think at that point, turning to Brady, relying, there's a lot of overlap on these issues, of course, relying on the same arguments that I presented on the McQuiggan issue, this evidence was not withheld because the We agree that you conceded that issue. Let's just get right to how could it not be favorable or material? Sure. Because I think in your brief as to the fingerprints, you never acknowledged that impeachment evidence would be Brady. You keep saying it didn't exculpate Dillman. Someone else's prints don't exculpate. But if Dillman testifies about the bottles and that being a significant factor for him, how isn't this necessarily favorable to a defense? Your Honor, I think the reason that the district court considered a Brady violation to have occurred here in part is because of the defense theory of the case that the perpetrator of the Hines murder and the victim, Bill Hines, drank together. As I mentioned, there's flaws in that theory according to the state. And in addition, the district court talked at length about the link between the Hines and the Robinson murders and how that affected the weight of the two confessions. There's significant differences in the evidence presented for those two individual murders. For the Robinson murder, there was other exculpatory evidence. I'm sorry. Just to be as precise as possible, that doesn't go to favorability. You're now telling me, okay, even if it were favorable, you're saying as to materiality, there's overwhelming proof? That's what you're arguing now, that even if it were favorable, it would be immaterial? Yes, Your Honor. I think even if this evidence, the fingerprint evidence specifically, were to be deemed to be withheld and favorable, it's just simply not material. Here, the state court, again, the judge was the fact finder, and the state court was able to personally observe these witnesses, of course, make these credibility determinations, and found, of course, that there was enough evidence to convict the respondent beyond a reasonable doubt of the Hines murder, and simultaneously acquit the respondent of the Robinson murder. Besides the confession that conflicts with the Robinson confession, what is the most powerful piece of proof you would point to that Floyd killed Hines? Your Honor, I think the confession has obviously made one. Besides that, there's also an admission made by the respondent to a bar owner in the after the incident at which he basically says to Mr. Edwards, I'm paraphrasing, but says to Mr. Edwards, I just wasted a guy over on Governor Nichols, which is the location of Bill Hines' apartment on Governor Nichols Street. That admission, on top of the confession made to Detective Dillman, that was the primary evidence provided at trial by the state. Again, that was enough for the state court judge to differentiate between the two crimes, the Hines and the Robinson crimes, and it appears I'm out of time. Yes, and you say you're full-time for rebuttal. Thank you, Mr. Cameron. Mr. Davis? Good afternoon, and may it please the court. My name is Richard Davis. I am from Innocence Project New Orleans, and I'm here on behalf of John Floyd, who is here in court with us today, sitting in the front row. As Judge Vance recognized, John Floyd's wrongful conviction and the failure of Louisiana courts to remedy it is the exact kind of extreme malfunction of the state criminal justice system that the writ of habeas corpus exists to cure. I'd like to begin by talking about the fingerprint evidence, as that occupied most of the state's argument, and I think the crucial point here is there is a clear distinction between the presence of someone else's fingerprints on what the court found were items that there was evidence it was particularly likely that the killer touched in the course of the crime, in the same way that there would be a huge difference between the absence of any witness and an eyewitness saying someone else did the crime. This is not just there being no evidence of a point, there being clear exculpatory evidence on the point, and Judge Vance discussed this distinction at length in her brief, and while the state is before the court now arguing that it has not been proved that the prints were disclosed, in its initial response to Mr Floyd's habeas application, it in fact conceded that the print comparison results had not been disclosed at trial, and Judge Vance both relied on that as a waiver, but also independently found that the evidence established that the fingerprint results had not been disclosed, that someone else's fingerprints were on this crucial crime scene evidence. Each side, of course, puts a legitimate adversarial spin on the record, and that's acceptable. You've heard opposing counsel and what he has said about what defense counsel knew and what the circumstances were with the fingerprints. Is there anything that he told us that you think was either inaccurate or incomplete that you'd like to elaborate on in terms of what the record shows about what people knew and what evidence was there? So, Your Honor, the record, there is absolutely no mention in the trial record of fingerprints that are not John Floyd's, fingerprints from someone else at trial. There are affidavits from the four prosecutors involved in the prosecution of the case saying that they do not believe they are aware of the fingerprint comparison results, and they believe anything they knew about would have been contained in their district attorney's file, and there was a concession by the prosecutor during state post-conviction proceedings that the fingerprint comparison results were not in their file. And then, in addition to that, Judge Vance went through the trial record and made findings concerning the distinction between how defense counsel spoke about other exculpatory evidence where he knew there was affirmative physical evidence from someone else as compared to the fingerprints where he merely talks about that there being an absence of fingerprint evidence, not the presence of someone else's fingerprint evidence at the crime scene. Are McQuiggan findings as to newness reviewed by us only for clear error? The factual findings will be, underline it, will be reviewed only for clear error. And the right that this record, no one has the closing arguments, just doesn't exist? I do not believe they are in the record before this Court. I'm not 100 percent sure about it. I believe they were transcribed at some point, but there is certainly no mention of someone else's fingerprints at the crime scene in the closing argument. Yes, if they existed, one of the two of you would have made sure they came to us, because as to a Brady analysis and materiality, it would be really important to see what was said. Okay. And, of course, McQuiggan's ruling is not just based on the fingerprints from the Heinz scene. There is the fingerprint evidence from the Robinson scene, and I did want to address the hair evidence from the Robinson scene, because I believe opposing counsel was mistaken in how he described it, but what was disclosed before the trial was a single hair in a hat in the corridor outside the room where the victim was killed in the Robinson case. What has been developed for the McQuiggan's analysis is hairs from the victim's bed and a hair on the napkin which someone had ejaculated on at the crime scene, and these were no part of the trial evidence, in fact. The defense specifically asked at trial to compare the hairs between the two crime scenes that appeared to come from African-American men, and was told by the analysts that the only hair from the Robinson scene was a hat hair from the head, and because the scenes from the Heinz scene came from an African-American man with pubic hairs, they couldn't be compared even visually. Roberts. Remind me again, why does further evidence showing that the trial judge got it right to acquit Esther Robinson relate to a McQuiggan sort of gateway issue as to Heinz? Fletcher. Two reasons, Your Honor. The first is that there's a difference between the judge finding his guilt was not proved a reasonable doubt at trial and Judge Vance's finding that is now overwhelming evidence that John Floyd is innocent of the Robinson murder, and that is significant because there is evidence that suggests the murders were committed by the same man, so if Mr. Floyd did not kill Rodney Robinson, that is evidence he did not kill Mr. Heinz. These are two very similar crimes that occurred 72 hours apart. Roberts. Did Floyd offer any details as to the Heinz murder that weren't in the photos that Dillman gave him? Fletcher. I believe there are some extremely generic details such as that the apartment is near the river in the French Quarter or something, and I think perhaps that the apartment had a bedroom or something like that, but only extremely high levels of generality is the information in the confessions that is not documented by the photos. The main point Dillman pointed to at trial, other than the drinking, was that he said that Mr. Floyd's confession corroborated where he put the clothes, but he was in fact mistaken, and what was documented of a crime scene was where the victim left his clothes. We have no idea where the perpetrator left his clothes. From McQuiggan, we would have to say no reasonable juror could have found there was evidence beyond reasonable. Is that fair? But it is likely that no reasonable jury would have. So what's wrong? Why wouldn't Judge Vance's analysis have been wrong as to that just based on Edwards, that a reasonable juror could have thought, well, he told a totally neutral person in the street, I wasted him, and that alone? Judge Vance considered the Edwards evidence and made several findings as to why it was weak and unreliable evidence. Wouldn't it be weak and unreliable, and that wouldn't meet the standard for McQuiggan's actual innocence? I think because McQuiggan's termed in terms of reasonable doubt as the underlying issue, that it is not, that there is no evidence of guilt at all. I think it would be instructive to compare this case to House v. Bell, where the Supreme Court found the standard had been met, and the majority of the new evidence presented by the defendant was evidence impeaching the forensic evidence of guilt, as opposed to here, when it is forensic evidence of innocence, something far more powerful. And then as to Mr. Edwards specifically, the court found that, one, there were some inconsistencies in how Mr. Edwards described this interaction. This was not an interaction he reported to the police. A police officer came and found him and asked for information about John Floyd. He didn't consider it significant enough to report, despite knowing Mr. Hines, who was the victim in the case. It is not Mr. Floyd who mentions Bill Hines in this supposed interaction. In any version, if the name Bill Hines is mentioned at all, Mr. Edwards is inconsistent as to whether the name was even mentioned. It is Mr. Edwards who raises it, and Mr. Floyd, who at most just says, yeah, afterwards. And Mr. Edwards described this as the kind of routine interaction one might have as a bar owner in the French Quarter, but he didn't think much of it until the police came to see him. And then, of course, there is the additional psychological evidence that Mr. Floyd is highly suggestible, which is relevant when considering he's responding to someone else saying, yeah, you mean Bill Hines. And that is, again, it's not clear even that Mr. Edwards said Bill Hines at the suppression hearing before trial. He was unclear if he had said the name had actually been said or not. And then an additional point is that there is overwhelming evidence that Mr. Floyd is innocent. He testified? Mr. Floyd testified, yes. And the alibi was good for both days, so it was the exact same defense? I wasn't even in the city or something? He testified he wasn't in the city at the presumed time of death of Mr. Hines because the body was not found. So that's a false exculpatory that would have applied as much to Robinson as to Hines? No, he testified it's an alibi for Robinson, but that he was in town and I think staying at a friend's house after Thanksgiving. So it's a different alibi, but it is the same testimony he's giving. And I think with regard to the idea of a false alibi, I think Judge Vance made the point that it's only a false alibi if you assume he's guilty, and there is a lot of evidence that he is, in fact, innocent of these crimes. So a new print to somebody else in the room, you wouldn't say, you accept R. Sipes' decision? That type of thing, broadly, is inconclusive, but does it truly depend on Dillman testifying to connect the two? I think the conclusion that comes from Dillman that the two people were drinking together, and that's a signature element of the crime, is what makes it, and Judge Vance found this, like, all that the analysts on the scene chose to dust for prints was a small number of selected items, which this was amongst, items that were all related to each other. But I think, at least when considering materiality, we're not just looking at the fingerprints in a vacuum, but we're looking at the fact that, based on all the problems with the confessions, this is a highly problematic case for the state at trial, given there is a host of problems with Mr. Floyd. And this is even in the state's own version of the interrogation. He protested his innocence. He was left alone with Detective Dillman. He then followed what Detective Dillman describes as a period of hysteria, confessed to both crimes simultaneously. The only reason they're even in separate documents is that the police called for district attorney and asked, should we put these two confessions in one piece of paper or two pieces of paper? And even in the is a specific, although written in very general terms, confession to the Robinson murder, which we know is false. And this is one of a number of specific false pieces of information in the confessions that Judge Vance noted. She specifically pointed to three false pieces of information between the two confessions John Floyd signed. And this particularly includes, and that she saw this was evidence of, possibly inadvertent, but evidence for the police giving information to John Floyd, whereas no information in the any way verifiable goes beyond what the police knew at the time they interrogated John Floyd. And none of this interrogation was recorded. It was simply in a room in the homicide office. And then a police officer types for confession for John Floyd to sign. And of course, there is evidence for John Floyd was unusually suggestible due to both his lifestyle, his low IQ, his suggestible personality type, and that he in fact, a trial he has asked to read from these but just there is a lot of evidence that it is not John Floyd. It's a classic example of the kind of case which would be viewed as a false confession. And Mr. Floyd is the exact kind of person who the Supreme Court in Atkins versus Virginia found is particularly susceptible to falsely confessing due to his IQ of 59. I wanted to talk a bit about because I have referred in summary terms to the overwhelming evidence that John Floyd is innocent of a thought it might be helpful to record as I have some time if I go through the specific items in that case because and this is what Judge Vance's conclusion was based on is there are in that case eight items of crime scene evidence that come from someone else. There is fingerprints on the passenger side of the victim's car. There are fingerprints on the glasses the victim and perpetrator shared. There are hairs in Mr. Robinson's bed. There is a hair on the napkin that someone presumably the perpetrator ejaculated on the crime scene. There is semen from the napkin and the rectal cavity of Mr. Robinson that does not match John Floyd. There is a hair on a blood stained hat that was found leading away from the crime scene and the hair does not come from Mr. Robinson does not come from Mr. Floyd. And then finally there is an African-American man seen her believe she witnessed the perpetrator making good his escape. You saw me about that question. If Judge Vance was correct in concluding it is timely because of McQuiggan, you still have a deference. Is your argument that the state courts were unreasonable in their application of Brady or is your argument that we know the implicit fact findings were erroneous? That it was unreasonable in his application of Brady, a 2254 D1 issue, Your Honor. But Dillman did testify at the state habeas proceeding, right? He did testify, yes. So that state court presumably had the Brady world in front of it, right? Because the fingerprint stuff at that point existed and was presented. It was presented. The state court No opinion ensues. No opinion is issued. We have to assume it did it all just right or not. We have to assume that you can only overrule the conclusion under Harrington v. Richter if it is unreasonable in the conclusion it reached. And I think here it is the court is unreasonable in the conclusion it reached both due to the significance of the evidence that was withheld and the weakness of the problems with the state's case at trial that there is at least some reasonable likelihood of a reasonable doubt. And I think it is significant that the only state court to write an opinion in this matter was a dissenting judge explaining why Mr. Floyd was entitled to Brady relief. That was a 4-3 vote. It was a 4-3 vote, Your Honor, yes. Arguably, that would tell me that the majority fully understood the Brady analysis because it's spelled out by Justice Johnson, is that? Yes, it was Justice Johnson, now Chief Justice Johnson. However, that was a 4-3 decision not to invoke review of the opinion. And then two judges dissented from not reviewing it. Judge Johnson then went further and said, not only would I review it, but I'm ready now to say that this is a Brady violation. There is also — and this is, I mean, because of the age of — Which is more unreasonable, that it's not — that it was favorable or that it — the immateriality, debatability of it all? I mean, I assume because favorable just means in any way helpful to the defendant, that is a lower standard to meet. So in that sense, I would say that it would be more unreasonable to say it's not favorable than not material. But I also think on the very I think, again, we have the confessions of the evidence of guilt, and Mr. Floyd is simultaneously acquitted of another crime to which he has confessed to. So this is — the State's case for guilt certainly leaves room for the possibility of acquittal when there is more forensic evidence of innocence, as there was in the Robinson case at trial. And at this time, the State is hiding further forensic evidence of innocence in the Hines case. I also wanted to address that the Brady finding was not purely based on the fingerprint evidence. That was also the statement of a John Rue Clegg, who — Judge Vance found his account credible, including that he had spoken to the police before trial, and that Detective Dillman had misrepresented what he said at trial. Mr. Clegg was not called as a witness by either party. And Judge Vance found that Detective Dillman's report and his testimony misrepresents what Mr. Clegg said, and that it was — Mr. Hines, as I'm sure it was called as well, was likely killed by a consensual sexual partner. Mr. Clegg, based on his friendship with Mr. Hines, said that he would assume such a person would be an African-American, and that he was, in fact, very surprised when a white man was arrested for the crime. And so this was additional Brady material, both — and as Judge Vance found, because it dovetails with the defense theory that Mr. Floyd did not do these crimes, both murders of the work of a single African-American man, whereas an African-American has at Hines' bed, in addition to all the evidence from the Robinson scene. And then, secondly — I didn't understand the Clegg point as well, because where's the Brady that was suppressed? Right? We have the prosecutors all saying we had the comparison fingerprint, didn't give it over. That's easy. But here it's Clegg, 20 years later, saying what — you know, the race point that you just described better than I can remember. So what was suppressed back at the time of trial as to Clegg? What was suppressed is that Clegg provided the same information — and he's very clear on this point — he provided the same information that he's provided now to the police. I'm sorry to interrupt, but he later says he gave the same information. But I don't see anything in the state — in the record that shows that at the time they knew he'd made that remark. Well, the police knew because he told it to Detective Dillman. If you credit him. And Judge Vance did credit him, Your Honor. She specifically found his account credible because of his relationship with the parties as a friend of the victim with no connection to Mr. Floyd. Okay. I see the argument. Yes. So that is — and, of course, something can be Brady even if it's not documented. The Brady rule applies to the information, not the form in which the state chooses to document it. And this was — But they didn't conceal the source of his statement at trial, right? The defense could have tracked it back to the intermediary friend. Theoretically, yes, but that is far more than Brady requires. I mean, the Supreme Court was very clear in Banks v. Drepke that the state cannot honor its Brady obligation by providing some trail of possible clues by which the defense might find the favorable evidence. And there is absolutely no evidence that this was disclosed. There is, in fact, affirmative evidence that misleading evidence was put before the defense at trial. And the Brady rule does not require the defense to assume that they've been given misleading evidence and go and speak to a witness the state has spoken to. That's — and this court has also addressed this point in Starnes v. Andrews that the defense is entitled to assume the state's agents can be taken at their word. But based on Judge Vance's findings, that would have been, while acceptable for defense, incorrect in this case. Describe the type document containing Clegg's giving this information before trial, giving it to the officers or to whomever he gave it. And the documentation is the statement Clegg signed approximately 10 years ago, a signed statement from Mr. Clegg adopting this is what occurred. Document before the trial, the document that should have been handed over to Floyd's lawyers. That was not a document, but my understanding, Your Honor, is that the Brady rule does not require the state to have a document. The Brady rule requires the state to disclose information, to hold any otherwise would be to incentivize prosecutors to just not write down information that was unhelpful to their case. The Brady rule is about the prosecution learning information. It doesn't have to be documented in a particular form. And it is documented that Detective Dillman spoke to Detective Clegg, whereas merely Detective Dillman's report stating one thing about what was said and Mr. Clegg saying the other. And Judge Vance made a very specific factual finding that she found Mr. Clegg's account reliable. All right. Thank you. I believe we have your argument. Thank you. Okay. Thank you very much. Thank you. So let me give you a hypothetical that you won't like, but I'd like you to deal with it. Assume that we disagree with you and find actual innocence, but we move to AEDPA. Explain then how the state can prevail. Obviously, you can prevail. The state can prevail on an AEDPA claim, even if there's actual innocence. But tell us how we would find that the application of clearly established federal law was not unreasonable by the state courts. Yes, sir. First, I'll note AEDPA is very clear about federal district courts deferring to the fact findings of the state courts. There's the presumed correct, the factual findings of state courts, and the respondent has a burden of rebutting that presumption by clear and convincing evidence. And what the state believes occurred in this case is that the district court did not properly defer to the fact findings of the state courts. So the first point on the Brady claim is that the state court fact finding was improperly overturned. Implicit finding. There was no state finding of fact, right? Implicit findings, yes, Your Honor. As to why the state court's determination was reasonable and is not worthy of habeas relief, we talked about the fingerprints at length. But to go back to what opposing counsel was discussing with the court, and the court made some reference to the due diligence aspect of Brady that's not part of the actual innocence standard. There's — in McQuiggan and its progeny, there's not really an element of the role that the defense plays. You finished his question about why EDPA. You wouldn't — we're past McQuiggan. We're asking you to assume we're past. Yes. So under Brady, obviously, there's a due diligence requirement. And here, for example, John Rue Clegg, let's take that. His name was included in the supplemental report created by Detective Dillman that was turned over to the defense. The state believes it is not — it doesn't go beyond Brady to say that it's within the due diligence of defense counsel to have figured out in real time, 30 years ago, what John Rue Clegg meant to say, if he meant to say anything different than what Detective Dillman reported. And under Brady, more specifically, there is case law in this court that says, yes, while there was no — maybe not a report or a document, per se, just the information itself from Mr. Clegg, if that information is not necessarily inconsistent with what was presented at trial, that's not withheld under Brady versus Maryland. And that case is, I believe, Callins versus — sorry, Castillo versus Johnson, 141 Federal 3rd, 218. That's a very important case, I think, on the John Rue Clegg statement, because what Mr. Clegg stated in his statement from 2008 is not necessarily inconsistent with what was reported by Detective Dillman. So Mr. Clegg said that — MR. CLEGG, I'm just looking at your clock. On the fingerprints, it's the opposite, because Dillman says, he told me we were drinking together. So what's your best Brady case on favorability and materiality? MR. CLEGG, what would you tell us to look to to conclude that fingerprint comparison is not favorable? MR. CLEGG, again, I — Judge, the — it's not favorable in this case because — MR. CLEGG, a case — I'm asking you for your best Brady case anywhere that would say fingerprint with somebody else at a murder scene isn't favorable, don't have to disclose. MR. CLEGG, Your Honor, I don't have a specific case on that point. What's your best case that it wouldn't be material? MR. CLEGG, again, Your Honor, this is mostly — comes back to the facts. MR. CLEGG, okay. That's fine. Go ahead. MR. CLEGG, and the facts are pretty clear, as borne out by the State court record, that all parties, again, going past the fact that the State believes the evidence wasn't withheld, it's not favorable or material because, despite what Detective It's not necessarily true that the perpetrator of the Hines murder and Bill Hines were drinking together, and it's not necessarily true that just because the fingerprints were found on a whiskey bottle, that that necessarily means that a third party was in the home of Bill Hines, the victim, that those fingerprints could have been left, again, by anyone, anywhere, at any location, maybe at the store where that whiskey was bought. Okay. And I think that's — you've made that point a couple of times. Thank you. Thank you very much. Your case is under submission. Last case for today, Louisiana.